UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

JAMES BRIAN HUFFMAN,

        Plaintiff,

v.                                    Civil Action No. 16-0710

NANCY A. BERRYHILL,
Acting Commissioner of the
Social Security Administration,

        Defendant.

## MEMORANDUM OPINION AND ORDER

        Pending are the objections filed on March 10, 2017, by
the Commissioner to the magistrate judge's Proposed Findings and
Recommendation ("PF&R").[1]

## I.  Procedural History

        On March 10, 2016, James Brian Huffman ("plaintiff")
instituted this civil action pursuant to 42 U.S.C. § 405(g).
Plaintiff seeks judicial review of the Commissioner's
administrative decision denying his application for disability
insurance benefits and supplemental security income.

---

[1] While Carolyn W. Colvin was the Acting Commissioner of Social
Security when plaintiff commenced this action, Nancy Berryhill
became the Acting Commissioner on January 23, 2017.

This action was referred to United States Magistrate Judge Dwane L. Tinsley for consideration, pursuant to 28 U.S.C. § 636(b)(1)(B) and standing order in this district. The magistrate judge filed his PF&R on February 28, 2017. In that document, the magistrate judge recommends that plaintiff's motion for judgment on the pleadings be granted, that the motion for judgment on the pleadings filed by the Commissioner be denied, that the Commissioner's final decision be reversed, and that the case be remanded to the Commissioner for further proceedings. See PF&R, 23. On March 10, 2017, the Commissioner filed objections to the PF&R. Plaintiff responded to the objections on March 20, 2017.

The Commissioner objects to the PF&R on two grounds. First, she states that the magistrate judge erred in finding that remand was required due to the ALJ's failure to evaluate plaintiff's IQ score of 70, because "an IQ score alone is insufficient to prove disability at the listings stage." Commissioner's Objections to PF&R ("Obj.") at 2. Second, she states that the magistrate judge erred in finding that the ALJ did not apply the special technique required by § 404.1520a(a) in assessing a claimant's mental impairments. Id. at 5.

## II.  Standard of Review

The court reviews de novo those portions of the
magistrate judge's PF&R to which objections are timely filed.
28 U.S.C. § 636(b)(1)(B); see Orpiano v. Johnson, 687 F.2d 44,
47 (4th Cir. 1982); see also 20 C.F.R. § 416.927(e)(1) (ultimate
decision regarding disability determinations rests with the
Commissioner).  On the other hand, the standard for review of
the Commissioner's decision is rather deferential to the
Commissioner, for, "[u]nder the Social Security Act, [a
reviewing court] must uphold the factual findings of the [ALJ]
if they are supported by substantial evidence and were reached
through application of the correct legal standard." Johnson v.
Barnhart, 434 F.3d 650, 653 (4th Cir. 2005); Oppenheim v. Finch,
495 F.2d 396, 397 (4th Cir. 1974) (court must scrutinize the
record as a whole to determine whether the conclusions reached
are supported by substantial evidence); see also 42 U.S.C. §
405(g).  Substantial evidence is that which "a reasonable mind
might accept as adequate to support a conclusion." Richardson
v. Perales, 402 U.S. 389, 401 (1971) (internal citations
omitted).

"In reviewing for substantial evidence, [a district
court does] not undertake to reweigh conflicting evidence, make
credibility determinations, or substitute [its] judgment for

3

that of the ALJ." <u>Johnson</u>, 434 F.3d at 653. Substantial evidence is by definition more than "a mere scintilla," <u>Smith v. Chater</u>, 99 F.3d 635, 638 (4th Cir. 1996), but "may be somewhat less than a preponderance," <u>Blalock v. Richardson</u>, 483 F.2d 773, 776 (4th Cir. 1972) (<u>quoting</u> <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1996)).

## III.  <u>Discussion</u>

### A.

The Social Security regulations establish a "sequential evaluation" for the adjudication of disability claims.  See 20 C.F.R. §§ 404.1520(a), 416.920.  The first question is whether the claimant is currently engaged in gainful employment.  §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).  If not, the second question is whether the claimant suffers from a severe impairment.  §§ §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  If so, the third question is whether the claimant's impairment meets or equals any of the specific impairments listed in Appendix 1 to Subpart P of the regulations.  §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  If it does, the claimant is considered disabled, and is awarded benefits.  <u>Id.</u> If not, the inquiry continues on to whether the claimant's impairments prevent the performance of past relevant work.  §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  If the claimant

satisfies this inquiry, the claimant establishes a prima facie case of disability, shifting the burden to the Commissioner for the fifth and final inquiry. <u>Hall v. Harris</u>, 658 F.2d 260, 264 (4th Cir. 1981); <u>McLain v. Schweiker</u>, 715 F.2d 866, 868-69 (4th Cir. 1983). The final inquiry is whether the claimant is able to perform other forms of substantial gainful activity considering the claimant's impairments, age, education and prior work experience. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

A special process is involved when the claimant alleges a mental impairment. §§ 404.1520a(a), 416.920a(a). The Social Security Administration ("SSA") must first evaluate the claimant's symptoms, signs and laboratory findings to determine whether claimant has a medically determinable mental impairment and document its findings. <u>Id.</u> If a medically determinable mental impairment is established, the ALJ must then "rate the degree of functional limitation resulting from the impairment" by examining the extent to which the impairment interferes with the claimant's "ability to function independently, appropriately, effectively, and on a sustained basis. §§ 404.1520a(b)(2), (c)(2) and 416.920a(b)(2), (c)(2). In doing so, the ALJ considers whether the claimant's "activities of daily living[,] social functioning[,] and concentration, persistence or pace" are mildly, moderately, markedly, or

extremely limited, or not limited at all.  §§ 404.1520a(c)(3),
(4) and 416.920a(c)(3), (4).  "A rating of 'none' or 'mild' in
the first three areas"—that is, activities of daily living;
social functioning; and concentration, persistence, or pace—
"and a rating of 'none' in the [category of episodes of
decomposition] will generally lead to a conclusion that the
mental impairment is not 'severe,' unless the evidence indicates
otherwise."  White v. Astrue, 637 F. Supp. 2d 363, 368
(S.D.W.Va. 2009) (quoting 20 C.F.R. §§ 404.1520a(d)(1) and
416.920a(d)(1)).  The ALJ then must determine if the mental
impairment is severe and if so, whether it qualifies as a listed
impairment.  § 404.1520a(d).  If the impairment is severe but
does not meet the requirements of a listing, the ALJ must assess
the claimant's residual functional capacity ("RFC") in light of
how all of the claimant's impairments constrain his work
abilities.  § 404.1520a(d)(3).  The ALJ must document each step
of this process.  § 404.1520a(e)(4).

At step one, the ALJ determined that plaintiff had not
engaged in substantial gainful activity from October 15, 2010,
the application date, through September 30, 2015, plaintiff's
date last insured.  Tr. at 14. At step two, the ALJ concluded
that plaintiff had the following severe impairments: a history
of a left tibia fracture, history of a T-11 fracture,

osteoarthritis, history of head traumas with borderline

intellectual functioning, history of a thoracic spine trauma,

and depression.  Id.  At step three, the ALJ concluded that

plaintiff's impairments did not meet or equal any listing

contained in the Listing of Impairments.  Id.  The ALJ next

found plaintiff to have a RFC to perform sedentary work, with

the additional limitations that the work be

> unskilled and low stress without high production demands;
> no more than simple, routine, repetitive tasks with simple
> instructions; no interaction with the public; and only
> minimal indirect contact with others at the worksite.

Id. at 16.  Based on plaintiff's RFC, the ALJ determined that he

could not return to his past relevant work, but could perform

jobs such as an inspector, machine feeder, or sorter.  Id. at

19-20.  Based on these findings, plaintiff was denied benefits.

Id. at 20.

## B.

The magistrate judge recommends that the court reverse

the decision of the ALJ and remand the case to the Commissioner

for further proceedings.  Specifically, the magistrate judge

concluded that the ALJ's decision is not based on substantial

evidence because, "the ALJ's failure to explain his reasoning

precludes a court from undertaking a 'meaningful review' of his

findings," particularly in light of evidence contained in the

7

record that plaintiff may meet or equal Listing 12.05C.  PF&R at
11-12.

        The Listing of Impairments, as a general matter,
describes, for each anatomical system, impairments that are
considered "severe enough to prevent an individual from doing
any gainful activity, regardless of his or her age, education,
or work experience."  20 C.F.R. §§ 404.1525(a), 416.925(a).  In
order to meet a listing, a claimant's impairment must "meet <u>all</u>
of the specified medical criteria."  <u>Sullivan v. Zebley</u>, 493
U.S. 521, 530 (1990) (emphasis in original).  "For a claimant to
qualify for benefits by showing that his . . . combination of
impairments . . . is 'equivalent' to a listed impairment, he
must present medical findings equal in severity to <u>all</u> the
criteria for the one most similar listed impairment."  <u>Id.</u>
(citing 20 C.F.R. § 416.926(a)) (emphasis in original).  The ALJ
must identify listings that are relevant to the claimant and
compare "'each of the listed criteria to the evidence of [the
claimant's] symptoms.'"  <u>Ketcher v. Apfel</u>, 68 F. Supp. 2d 629,
645 (D. Md. 1999) (quoting <u>Cook v. Heckler</u>, 783 F.2d 1168, 1172
(4th Cir. 1986).

Listing 12.05 provides,[2] in pertinent part,

> Intellectual disability: Intellectual disability
> refers to significantly subaverage general intellectual
> functioning with deficits in adaptive functioning initially
> manifested during the developmental period; i.e., the
> evidence demonstrates or supports onset of the impairment
> before age 22.
>
> The required level of severity for this disorder are
> met when the requirements in A, B, C, or D are satisfied.
>
> . . .
>
> C. A valid verbal, performance, or full scale IQ of 60
> through 70 and a physical or other mental impairment
> imposing an additional and significant work-related
> limitation of function;
>
> . . .

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05.

In order to meet Listing 12.05C, a claimant must satisfy the requirements of the introductory paragraph to the listing as well as the specific criteria of paragraph C. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00A.

Pertaining to Listing 12.05C, the ALJ concluded,

> [T]he "paragraph C" criteria of listing 12.05 are not met
> because the claimant does not have a valid verbal,
> performance or full scale IQ of 60 through 70 and a
> physical or other mental impairment imposing an additional
> and significant work-related limitation of function. The
> evidence failed to establish IQ scores prior to the age of

---

[2] Effective September 3, 2013, the term "mental retardation" was replaced with "intellectual disability" in Listing 12.05 because "[t]he term 'intellectual disability' is gradually replacing the term 'mental retardation' nationwide" due to its negative connotations. 78 FR 46499-01, 2013 WL 3936340.

> 22 and significant restrictions in adaptive behavior as
> required in the listing.

Tr. at 16.

According to the magistrate judge, "the record contains evidence suggesting that [plaintiff] may meet or equal Listing 12.05C." PF&R at 12. The ALJ mentions elsewhere in his opinion that plaintiff had IQ subscores ranging from 62 to 81 and a full scale IQ score of 70 during his evaluation, when he was 37 years old, by Joann Daley, M.A. Ed.S., a clinical psychologist, in December 2012.[3] Tr. at 18. This does seem to contradict his statement at step three that plaintiff "does not have a verbal, performance, or full scale IQ of 60 through 70." Id. at 16. The magistrate judge was unable to determine whether the ALJ "erroneously overlooked" the IQ score or dismissed it because it was not obtained before plaintiff, whose date of birth is November 4, 1975, was 22. PF&R at 12. The magistrate judge found that although the relevant IQ score in 2012 was not obtained before plaintiff was 22, "there are many possible reasons why an adult would not have obtained an IQ test early in life and the absence of an IQ test during the developmental years does not preclude a finding of mental retardation predating age 22. . . . [I]n the absence of any evidence of a

---

[3] The ALJ mistakenly refers to Joann Daley as Joann Bailey in the decision. Tr. at 18.

change in a claimant's intelligence functioning, it must be assumed that the claimant's IQ had remained relatively constant."  PF&R at 12-13 (citing <u>Luckey v. U.S. Dept. of Health & Human Services</u>, 890 F.2d 666, 668 (4th Cir. 1989).

The Commissioner argues that the magistrate judge erred in finding remand was required for the ALJ's failure to consider plaintiff's IQ score of 70.  The Commissioner does so because the ALJ found that plaintiff failed to meet the other requirements of Listing 12.05C.  Obj. at 2.  According to her, "regardless of Plaintiff's IQ score, the ALJ reasonably found that Plaintiff failed to meet his burden of proof because he did not establish significant deficits in adaptive functioning as required by the Listing."  <u>Id.</u> at 3.  In support of this contention, the Commissioner cites to evidence in the record including,

> [P]laintiff had a strong employment history and worked for more than a decade as a construction laborer with a labor union, a job that required him to use machines, tools, and equipment such as jackhammers (Tr. 31, 174-76).  Indeed Plaintiff's earnings show that he worked regularly between 1993 and 2010, earning between $20,000 and $30,000 for several years (Tr. 164).  The record also suggests that Plaintiff did not stop working in 2010 due to his borderline intellectual functioning, but because he was laid off from his job (Tr. 32).
>
> In addition to a strong work history, the record also demonstrates that Plaintiff was able to perform and did perform a variety of activities that are inconsistent with the definition of deficits in adaptive functioning . . . .  Notably, Plaintiff lives in a house with his wife who works

full-time; cooks simple meals; helps dad on a farm; drives
a four-wheeler or tractor; watches football on TV and can
follow the course of the game; watches television news;
cares for his personal needs; and speaks regularly on the
phone with his family (Tr. 34, 188, 191).

Obj. at 3-4.

In response, plaintiff cites to <u>Luckey</u>, 890 F.2d at

669, for the proposition that the Commissioner "may not rely

upon previous work history to prove non-disability where the

Section 12.05C criteria are met."  Pl.'s Resp. to Obj. ("Resp.")

at 3.  In addition, plaintiff argues that the activities of

daily living that he can complete to which the Commissioner

cites are "familiar and repetitive undertakings [that] are quite

compatible with the typical abilities of a person with

intellectual disabilities."  <u>Id.</u> at 4.  Plaintiff additionally

argues that the ALJ failed to address some evidence that weighed

in his favor.  <u>Id.</u>

Adaptive functioning is not defined in the version of

section 12.00 effective when plaintiff's claim was considered.

The new version of section 12.00, which became effective January

17, 2017, states that adaptive functioning "refers to how you

learn and use conceptual, social, and practical skills in

dealing with common life demands.  It is your typical

functioning at home and in the community, alone or among others." [4] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00.

The ALJ's limited discussion of Listing 12.05C may be due to the fact that some evidence in the record indicated that plaintiff's impairments may have been occasioned, in part, by head injuries he sustained from motor vehicle accidents in 2003, 2004 and 2008 and an assault in 2012, and not to an intellectual disability, so that he did not have the requisite deficits in adaptive functioning prior to age 22 required by the listing. Tr. at 17. The ALJ found that,

> The claimant sustained injuries in multiple remote motor vehicle accidents in August 2003, April 2004, and in October 2008. . . . The latter accident resulted in a sustained head injury with loss of consciousness. . . . The claimant reported an assault in December 2012 but computerized tomography scans of the head revealed no intracranial abnormalities and otherwise no evidence of acute sustained injury.

Id. Indeed, at the hearing before the ALJ, counsel for plaintiff stated, "It's my contention that the claimant equals the listing at 12.05[C], although we're lacking evidence that his mental limitations were that severe prior to age 22. He does have that history of substance abuse and instances of head

---

[4] Effective January 17, 2017, section 12.00 was amended. Because plaintiff's denial of disability was effective on November 27, 2015 when the Appeals Counsel denied his claim, the court will analyze plaintiff's impairments under the Listing effective on that date.

injuries. . . . But overall I would ask that you consider the listing of 12.05[C] at least on an equivalence scale based on the valid full scale IQ of 70 and the head trauma he has sustained."  Tr. at 28-29.

The ALJ also discussed evidence relevant to his determination that plaintiff did not have deficits in adaptive functioning elsewhere in his decision.  The ALJ made later findings that

> The records failed to identify significant ongoing care for the claimant's physical and mental complaints. . . . His failure to obtain significant medical intervention suggests his conditions were not as limiting as alleged. . . . His capacity to work and his testimony of a layoff, as well as the limited medical intervention obtained from 2008 through 2010 while he was gainfully employed as well as limited evidence of exacerbating factors, adversely affected the credibility that his limitations in working were a product of his injuries and related more likely, to his layoff.

Tr. at 17.  The ALJ also discussed a November 2012 consultative examination with Donna Cook, M.A., where he was diagnosed with "depressive disorder, learning disorder, and a history of opiate dependence in early full remission."  Id. at 18.  Ms. Cook "suggested the claimant would be unable to independently manage personal benefits."  Id.

The ALJ discussed plaintiff's December 2012 evaluation by Joann Daley, M.A. Ed.S.  Id.  Ms. Daley reported that plaintiff "would not be considered competent to manage

disability benefits in his own best interest." Id. It was during that intellectual assessment by Ms. Daley that he received a full-scale IQ score of 70 and, pertinent to his mental impairments, he was diagnosed with learning disorder, not otherwise specified, and mild mental retardation. Id. Her diagnosis of mild mental retardation was based upon his IQ score of 70, history of special education classes in school and low achievement scores. Id. at 314. In addition to administering an IQ test to plaintiff, Ms. Daley administered the Wide Range Achievement Test, Fourth Edition (WRAT-4), where plaintiff was found to have spelling and arithmetic skills of a third grade student and reading skills of a fifth grade student. Id. at 313. The ALJ gave "some weight" to Ms. Daley's opinion, stating "[t]he opinions and observations supported restrictions to unskilled low stress work." Id. at 18.

The ALJ also mentioned the review of records done by Rosemary Smith, Psy.D., from Disability Determination Services in February 2013, and he noted that "moderate restrictions in activities of daily living, social functioning and concentration suggested limitations to 1-2 step commands involving simple instructions in environments that entail only occasional and superficial interactions with others." Id.

According to Dr. Smith's notes, plaintiff again saw Ms. Daley for a mental status exam on January 30, 2013.  <u>Id.</u> at 50.  Ms. Daley found plaintiff's mood to be depressed and tearful; his affect restricted; his immediate memory within normal limits; his recent memory within normal limits; his remote memory mildly deficient; his concentration, persistence and pace mildly deficient; and his social functioning mildly deficient.  <u>Id.</u> at 50.  Ms. Daley diagnosed plaintiff with: depressive disorder, alcohol abuse, opioid dependence in full remission, personality disorder with borderline traits, borderline intellectual functioning and again found him not to be competent to manage his own benefits.  <u>Id.</u> at 50.  Dr. Smith also discussed Ms. Daley's second set of diagnoses, which did not include mild mental retardation, stating,

> Although at the CE [consultative examination,] social functioning and C/P/P [concentration, persistence or pace] were not significantly limited, his ADL's [activities of daily living] support more severe deficits.  Per the CE psychologist, the claimant has borderline intellectual functioning rather than mild mental retardation.  The GAI of 77 and his ADL's / work history support functioning in the borderline range.[5]

<u>Id.</u> at 52.  Thus, apparently, Ms. Daley changed plaintiff's diagnosis from mild mental retardation to that of borderline

---

[5] **GAI or General Ability Index is an optional index score for the WAIS-IV.  Dr. Jianjun Zhu, Ph.D., Susan Engi Raiford, Ph.D., Diane Coalson, Ph.D., The What, When and How of the Wechsler General Ability Index (Pearson 2007).**

intellectual functioning when plaintiff saw her in January, 2013 for a mental status exam.[6]

The ALJ additionally described a functioning report that noted limitations including "talking, remembering, completing tasks, concentrating, understanding, following instructions, and getting along with others." Id. at 17. The ALJ noted that the report included plaintiff's daily activities which included "watching television, eating meals requiring limited preparation, and interacting on the phone with family." Id. While not discussing the grade level completed by plaintiff, the ALJ did note that he has a "marginal education." Id. at 19.

Based upon his decision, the ALJ determined that plaintiff did not have the requisite deficits in adaptive functioning prior to age 22 due to his "capacity to work," as well as evidence that despite not completing high school, plaintiff was capable of performing tasks such as making meals with limited preparation, talking on the phone with family

---

[6] Borderline intellectual functioning is said to occur when a person has below average cognitive ability, but the person's cognitive restrictions are not as severe as someone with mild mental retardation or an intellectual disability. J.E. Schmidt, M.D., Attorney's Dictionary of Medicine (LexisNexis 2014).

members, and driving until his license was suspended.[7]  See Tr.
at 16-19, 30.  Plaintiff told the ALJ at his hearing that he
loves to watch football and that he understands the rules of the
sport and also watches the news.  Id. at 36.  In addition, the
record evidence indicates that plaintiff's mental impairments
may have been associated with head injuries he sustained after
age 22, not from an intellectual disability; however, as noted
below, the defendant had substantial earnings, in 2008 and 2010,
despite his injuries in 2003, 2004 and 2008.

        As discussed by the ALJ, the evidence in the record
demonstrates that plaintiff has worked at "substantial gainful
levels."  Id. at 17, 164.  Plaintiff worked as a construction
laborer from 1993 until 2010, when, according to him, he was
laid off.  Id. at 164, 31-32.  The tasks plaintiff completed at
his job included shoveling dirt, using a jackhammer, carrying
supplies and materials, climbing ladders and scaffolding, and
lifting materials.  Id. at 175-76.  In fact, in 2008, plaintiff
earned $30,167.34, and in 2010, plaintiff earned $21,350.22
despite being laid off in October of that year when he was 34
years old.  Id. at 164, 31-32, 174.

---

[7] At the hearing before the ALJ on June 5, 2014, plaintiff stated
his driver's license was suspended "at least" five or six years
ago, but he does not state the reason for the suspension.  Tr.
at 30.

Plaintiff cites to <u>Luckey</u> for the proposition that a claimant's work history cannot be used to determine he is not disabled when he meets the criteria for Listing 12.05C. 890 F.2d at 669. While it is true that work history cannot preclude benefits when a claimant otherwise meets the criteria for Listing 12.05C, a claimant's work history is relevant in determining whether a claimant displayed deficits in adaptive functioning prior to age 22. <u>See</u> <u>Hancock v. Astrue</u>, 667 F.3d 470 (4th Cir. 2012) (finding that the ALJ's determination that the claimant did not establish the requisite deficit in adaptive functioning to be supported by substantial evidence where the ALJ considered, among many other factors, that the claimant had worked several jobs); <u>see</u> <u>also</u> <u>Cheatum v. Astrue</u>, 388 Fed. Appx. 574, 576 n. 3 (8th Cir. 2010) ("[E]vidence of [the claimant's] ability to perform gainful activity is not relevant if she otherwise meets the requirements of Listing 12.05. It is relevant, however, to whether she has shown the deficits in adaptive functioning necessary to meet that listing."). It was proper for the ALJ to consider and rely on plaintiff's ability to work as a construction laborer in finding that he lacked deficits in adaptive functioning prior to age 22.

Plaintiff argues, as the magistrate judge found, that the ALJ failed to discuss some of the evidence relating to his

deficiencies in adaptive functioning, including his dropping out of school after seventh or eighth grade, and the fact that he was in special education classes.  See PF&R at 15, Resp. to Obj. at 4-5.  It is for that reason, they contend, that the decision is not supported by substantial evidence.  Yet, the ALJ did note that plaintiff had a marginal education and so took into account his level of education.  Tr. at 19.

The ALJ's determination that plaintiff did not meet or equal Listing 12.05C was also supported by the evidence discussed in his decision that plaintiff sought emergency room treatment after multiple incidents where he experienced head trauma and that this was more likely the cause of his impairments, not intellectual functioning.  Plaintiff was involved in a motorcycle accident in August 2003 where he received a left tibia fracture.  Tr. at 275.  In April, 2004 plaintiff reported to the emergency room at Charleston Area Medical Center after he fell off his dirt bike at approximately 40 m.p.h. while doing wheelies.  Id. at 253.  He complained of pain in his right lower extremity, ribcage, upper and mid back, buttocks, left hip, femur, knee, tibia, fibula, and abdomen. Id.  He was diagnosed with a minor T11 fracture that did not require bracing or surgery.  Id. at 258.

In October 2008, plaintiff again presented at the emergency room of Charleston Area Medical Center after a motor vehicle accident.  Tr. at 227.  Plaintiff was forced off the road while going 35-40 m.p.h. and he was not wearing a seatbelt. Id.  He complained of loss of consciousness, headache, neck and chest pain, and hurt knees.  Id.  A CT scan revealed a single punctuate area of high density within the right parietal lobe, which was thought to represent averaging effects from a cortical vein or area of hemorrhage.  Id.  Although plaintiff was advised to follow up, it does not appear from his medical records that he did so.  Id. at 237-38.

In June 2011, plaintiff presented to the emergency room at Thomas Memorial Hospital complaining of pain from a car accident that had occurred a week before.  Id. at 291.  He denied any blows to the head, neck pain, loss of consciousness, or seizure.  Id.  He was diagnosed with a contusion to the chest and was given prescriptions for Tylenol with Codeine and Zofran and was discharged.

In December 2012, plaintiff presented to the emergency room at Charleston Area Medical Center following an assault in his home.  Id. at 333.  Plaintiff reported that he was standing on a chair in his home cleaning when some individuals came into his home and knocked him off the chair.  Id.  He complained of

left foot and chest pain but denied losing consciousness.  Id.
A head CT scan revealed no evidence of acute intracranial
process or sinus disease.  Id. at 331.  Plaintiff was given
Toradol and a left foot splint.  Id.

At his consultative exam with Kip Beard, M.D. on
November 1, 2012, plaintiff reported that since his 2004
accident, he experienced ongoing headaches, at a rate of around
two headaches per month.  Id. at 299-300.  The ALJ noted from
this examination that plaintiff had "headaches atypical for
migraine possibly secondary to trauma."  Id. at 18.

From his decision, it is apparent that the ALJ
discussed the evidence in the record and came to the conclusion
that plaintiff had not established deficits in his adaptive
functioning prior to age 22 due to plaintiff's ability to work
for 17 years in a job where he was required to operate heavy
equipment, his ability to prepare simple meals, watch and
understand television programs and speak on the phone with his
family.  Further, there is evidence in the record that
plaintiff's mental impairments were attributable to repeated
head trauma he suffered after age 22, occurring from 2003 to
2012, and not to an intellectual disability.  Although the ALJ
erred in failing to discuss plaintiff's IQ score of 70 at step
three, this error is harmless because plaintiff did not

establish he had deficiencies in adaptive functioning prior to age 22 as required by the listing.  The ALJ's decision is thus supported by substantial evidence.

C.

The Commissioner next contends that the magistrate judge erred in finding that the ALJ did not apply the special technique required in assessing plaintiff's mental impairments. Obj. at 5.

The magistrate judge found that the RFC was not based on all of plaintiff's medically determinable impairments. According to the magistrate judge, "the ALJ did not explain how or if the ALJ weighed [plaintiff's] scores from the IQ evaluations" of Ms. Daley in 2012.  PF&R at 15.  The magistrate judge also determined that the ALJ failed to weigh other evidence in the record, including that plaintiff dropped out of school after seventh grade, attended special education classes, and the [Disability Determination Explanation ("DDE")] performed by Dr. Gajendragadkar and Dr. Lilly regarding [his] treatment at Riverpark Hospital." Id.  The magistrate judge cited to Patterson v. Comm'r of Social Security Admin., 846 F.3d 656 (4th Cir. 2017), and Mascio v. Colvin, 780 F.3d 632, 636 (4th Cir. 2015), for the proposition that because the ALJ's RFC assessment did not resolve all inconsistencies in the evidence as a whole

as required under SSR 96-8," remand is required for further evaluation of the evidence of record.  PF&R at 17.

Between the third and fourth steps of the disability determination process, the ALJ must determine a claimant's residual functional capacity, or RFC.  "Ordinarily, RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continued basis."  SSR 96-8p, 1996 WL 374184 at 1 (S.S.A. July 2, 1996).  The RFC determines the most "an individual can do despite his or her limitations or restrictions.  Id.  To determine a claimant's RFC, the ALJ "must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis."  Id. at 1.  The RFC is then used to determine: (1) whether a claimant can perform past relevant work as it was actually performed; (2) the appropriate exertional level (sedentary, light, medium, heavy, or very heavy) for the claimant; and (3) whether the claimant can perform all of the work required for that exertional level.  Id. at *7

In Mascio v. Colvin, 780 F.3d 632 (4th Cir. 2015), our court of appeals addressed the ALJ's duties when making an RFC assessment, as stated in Social Security Ruling 96-8p.  In order to properly determine a claimant's RFC, the ALJ must "include a

narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96-8p, 1996 WL 374184 at 7. The ALJ must also "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." Id. In making the RFC assessment, the ALJ "must always consider and address medical source opinions." Id. If an RFC assessment conflicts with a medical source opinion, the ALJ must explain why the opinion was not adopted. Id.

After describing the requirements of SSR 96-8p, the court in Mascio explained that, "a per se rule requiring remand when the ALJ does not perform a function-by-function analysis . . . is inappropriate given that remand would prove futile in cases where the ALJ does not discuss functions that are 'irrelevant or uncontested.'" Mascio, 780 F.3d at 636 (quoting Cichocki v. Astrue, 729 F.3d 172, 177 (2d Cir. 2013). Instead, the court adopted the approach of the Second Circuit, holding that "'[r]emand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review.'" Id. (quoting Chichocki, 729 F.3d at 177).

As noted above, when a claimant alleges a mental impairment, the ALJ must follow an additional process to evaluate and document the severity of a claimant's mental impairment. § 404.1520a(a). The ALJ "must specify the symptoms, signs, and laboratory findings that substantiate the presence of the impairment(s) and document [his] findings." § 404.1520a(b)(1). The ALJ must then document specific findings as to the degree of limitation in each of the following areas of functional limitations: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decomposition. § 404.1520a(b), (c). After determining whether the mental impairment is severe, the ALJ decides whether it meets a listed impairment. § 404.1520a(d). If a mental impairment is severe but is not a listed impairment, "the ALJ must assess the claimant's RFC in light of how the impairment constrains the claimant's work abilities." § 404.1520a(d)(3).

With regards to the second step of the special technique, the ALJ stated,

> In activities of daily living, the claimant has moderate restriction. In social functioning, the claimant has moderate difficulties. With regard to concentration, persistence or pace, the claimant has moderate difficulties. As for episodes of decompensation, the claimant has experienced no episodes of decompensation, which have been of extended duration. Explanation provided

below. The evidence failed to support restrictions of this
magnitude prior to obtaining opinions of consultative
examiners and reviewing sources. However, the opinions of
two practitioners reviewing the record supported moderate
restrictions.[8] Given to [sic] affirming opinions, the
moderate limitations were adopted.

. . .

The limitations identified [above] are not a residual
functional capacity assessment but are used to rate the
severity of mental impairments at steps 2 and 3 of the
sequential evaluation process. The mental residual
functional capacity assessment used at steps 4 and 5 of the
sequential evaluation process requires a more detailed
assessment by itemizing various functions contained in the
broad categories found in paragraph B of the adult mental
disorders listing in 12.00. . . . Therefore, the following
residual functional capacity assessment reflects the degree
of limitation the undersigned has found in the "paragraph
B" mental function analysis.

Tr. at 15-16.

After determining that plaintiff's mental impairments

were severe but did not meet or equal a listed impairment, the

ALJ assessed plaintiff's RFC. As noted, the ALJ assessed

plaintiff with an RFC to perform sedentary work, with the

additional limitations that the work be

unskilled and low stress without high production demands;
no more than simple, routine, repetitive tasks with simple
instructions; no interactions with the public; and only
minimal indirect contact with others at the worksite.

_____

[8] Drs. Smith and Lilly were the two practitioners who reviewed
the record and found plaintiff to have moderate restrictions.
Tr. at 55-56, 69-70.

Id. at 16. The ALJ's determination that plaintiff could only perform sedentary work was due to his physical impairments and the consultative examination by Kip Beard, M.D. in November 2012 where he found plaintiff to have a 20% compression fracture in the anterior T11 vertebrae, a left tibia fracture post reduction and fixation, chronic arthralgias, possible prostatic hyperplasia, and headaches atypical for migraines possibly secondary to trauma. Id. at 17-18. The other limitations imposed in the RFC were due to plaintiff's mental impairments.

The ALJ discussed plaintiff's testimony from the hearing and discredited his statements based on his lack of "significant ongoing care for [his] physical and mental complaints" as well as "[h]is capacity to work and his testimony of a layoff." Id. at 17. The ALJ then discussed the consultative examination of Donna Cook, M.A., whose opinion he found "supported restrictions to unskilled low stress work as the claimant presented with some difficulties with concentration. However, given the absence of intervention required," he concluded that "the evidence failed to support additional restrictions." Id. at 18. The ALJ also mentioned Ms. Daley's IQ assessment and diagnoses of learning disorder and mild mental retardation, finding "[t]he opinion and observations supported restrictions to unskilled low stress work and has some

weight." Id.  As discussed, Dr. Smith's notes of plaintiff's

mental status exam by Ms. Daley indicate she changed her

diagnosis from that of mild mental retardation to borderline

intellectual functioning.  Id. at 50-52.  As to Dr. Smith's

determinations that plaintiff had moderate restrictions in

activities of daily living, social functioning, and

concentration, the ALJ stated these findings suggested

"limitations to 1-2 step commands involving simple instruction

in environments that entail only occasional and superficial

interactions with others."  Id. at 18.

        After discussing the evidence pertinent to the RFC,

the ALJ concluded "In sum, the . . . residual functional

capacity assessment is supported by the claimant's alleged

limitations, lack of objective medical findings, limited

treatment, absence of complaints while receiving care, and

presentation for examinations noted above."  Id.

         The ALJ thus followed the special technique in

discussing plaintiff's mental impairments.  In addition, as

previously discussed, the ALJ conducted an analysis, applying

the special technique to evaluate plaintiff's degree of

functional limitations from his mental impairments; in doing so,

the ALJ considered plaintiff's self-reports, treatment records,

and the consultative findings and opinions.  In determining

plaintiff's RFC, the ALJ considered the opinions of Dr. Smith and Dr. Debra Lilly, Ph.D., finding that their opinions supported moderate restrictions even though "the evidence failed to support restrictions of this magnitude prior to obtaining" these opinions. Tr. at 15. In addition, the ALJ accepted Dr. Smith's recommendation to limit plaintiff to 1 to 2 step commands involving simple instructions with only occasional interactions with others. Id. at 18.

Plaintiff states that the ALJ failed to explain evidence in the record such as how he weighed the IQ score given by Ms. Daley. PF&R at 15. However, as noted, the ALJ described plaintiff's test scores and the diagnoses, including that of mild mental retardation given by Ms. Daley before stating that "[t]he opinions and observations supported restrictions to unskilled low stress work and has some weight." Tr. at 18. In addition, an ALJ "is not required to comment in the decision on every piece of evidence in the record, and the ALJ's failure to discuss a specific piece of evidence is not an indication that the evidence was not considered." Brewer v. Astrue, No. 7:07–CV–24–FL, 2008 WL 4682185, at *3 (E.D.N.C. Oct. 21, 2008).

The magistrate judge additionally found that the ALJ failed to explain and weigh the DDE performed by Dr. Gajendragadkar and Dr. Lilly, stating

> The ALJ only mentioned Dr. Lilly in stating that she
> affirmed Dr. Franyutti's 2011 opinion upon review in March
> 2013. However, upon review of the record it is unclear
> whether this is a correct statement. Dr. Franyutti's
> review is dated November 8, 2012 (Tr. at 55, 58).
> Additionally, on March 4, 2013, Dr. Lilly specifically
> stated that she affirms the PRTF (psychiatric review
> technique) of February 5, 2013 (Tr. at 66) and the MRFC
> (medical residual functional capacity assessment) of
> February 5, 2013 (Tr. at 71). Ms. Smith's review was dated
> February 5, 2013 (Tr. at 56). It is unclear if Dr. Lilly
> reviewed Dr. Franyutti's November 8, 2012 opinion.

PF&R at 15. At the initial level of consideration for benefits,

Dr. Smith reviewed plaintiff's medical records for mental

impairments and completed a RFC form as to those mental

impairments on February 5, 2013. Tr. at 48-52, 55-56. Also at

the initial level of consideration, Dr. Fulvio Franyutti, MD,

reviewed plaintiff's medical records for physical impairments

and completed a RFC form as to those physical impairments on

November 8, 2012. Id. at 52-55.

At the reconsideration level, Dr. Lilly reviewed

plaintiff's mental impairments and completed a RFC form as to

those impairments on March 4, 2013. Id. at 65-66, 69-71. Dr.

Lilly reviewed Dr. Smith's findings that plaintiff did not meet

or equal a listing relating to his mental impairments as well as

her RFC determination. See id. at 66, 71 ("I have reviewed all

the evidence in the file and the PRTF of 2/5/13 is affirmed, as

written"). Also at the reconsideration level, Dr. Subhash

Gajendragadkar, M.D. reviewed plaintiff's medical records

relating to his physical impairments and completed a RFC form as to those physical impairments on March 1, 2013.  Id. at 66-69. Dr. Gajendragadkar affirmed the findings of Dr. Franyutti as to his findings that plaintiff did not meet or equal a listing and his RFC determinations.  Id. at 62.

The ALJ discussed the findings and RFC determinations of Dr. Smith as to plaintiff's mental impairments and Dr. Franyutti as to plaintiff's physical impairments.  Id. at 18. While it does appear that the ALJ erred in stating that Dr. Lilly affirmed Dr. Franyutti's opinions, because Dr. Gajendragadkar in fact affirmed Dr. Franyutti's opinions, this error is harmless inasmuch as it does not demonstrate that the ALJ failed to review the opinions of Drs. Lilly and Gajendragadkar.  It appears that the ALJ confused the names of the two doctors because their reviews both occurred at the reconsideration level.  Additionally, Drs. Lilly and Gajendragadkar affirmed the initial level opinions of Drs. Smith and Franyutti, and noted the same RFC restrictions that they did, which the ALJ discussed and included in plaintiff's RFC.

The ALJ reviewed and weighed the evidence in the record, and despite sparse treating records regarding plaintiff's impairments, he formulated an RFC that took into account plaintiff's testimony, medical records and the

recommendations of the consultative examiners.  Id. at 16.

Based upon this evidence, the RFC limits plaintiff to unskilled

and low stress sedentary work that has only simple, routine,

repetitive tasks with simple instructions and limited contact

with others.  Id.  Thus, it is seen that the ALJ took into

account plaintiff's mental impairments when formulating his RFC.

The court finds that the ALJ appropriately applied the special

technique and that the RFC based on plaintiff's mental

impairments is supported by substantial evidence.

D.

In plaintiff's brief in support of judgment on the

pleadings, he additionally argues that the ALJ erred in

assessing plaintiff's credibility, stating that he only

considered the evidence from plaintiff's physical impairments,

and not his mental impairments.  Pl.'s Br. in Supp. of Judgment

on the Pleadings at 16.

SSR 96-7P clarifies when the disability evaluation

"requires a finding about the credibility of an individual's

statements about pain or other symptom(s) and its functional

effects" and "to explain the factors to be considered in

assessing the credibility of the individual's statements about

symptoms." SSR 96-7P, 1996 WL 374186, at *1 (S.S.A. Jul. 2,

1996).[9]  According to SSR 96-7P, the ALJ first determines whether the claimant's medically determinable medical and psychological conditions could reasonably be expected to produce the claimant's alleged symptoms.  _Id._ at *2.  Next, the ALJ must evaluate the intensity, persistence, and severity of the symptoms to determine the extent to which they prevent the claimant from performing basic work activities.  _Id._  Whenever the intensity, persistence, or severity of the symptoms cannot be established by objective medical evidence, the ALJ must assess the credibility of any statements made by a claimant to support the alleged disabling effects based upon the entire case record.  _Id._

The factors that the ALJ should consider in evaluating the claimant's credibility, emphasizing the importance of explaining the reasons supporting the credibility determination. In performing this analysis, the ALJ must take into consideration "all the evidence," including: the claimant's subjective complaints; claimant's medical history, medical signs, and laboratory findings; any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.); and any other

---

[9] Although SSR 96-7P was superseded by SSR 16-3P, 2016 WL 1237954, effective March 24, 2016, SSR 96-7P was in effect at the time of the ALJ's decision.

evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities; specific descriptions of the pain; the location, duration, frequency and intensity of symptoms; precipitating and aggravating factors; any medical treatment taken to alleviate it; and any other factors relating to functional limitations and restrictions. Id. at *3.

Contrary to plaintiff's assertions, the ALJ considered plaintiff's mental as well as physical impairments in making his finding that plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." Tr. at 17.

Relating to plaintiff's testimony, the ALJ stated,

> The claimant testified to back problems, numbness in his hands, memory difficulties, getting lost, and difficulties concentrating. He reported problems sitting longer for 30 minutes . . . and performing his activities of daily living. A functioning report provided prior to the hearing noted limitations of . . . talking, remembering, completing tasks, concentrating, understanding, following instructions, and getting along with others. The daily reported activities included watching television, eating meals requiring limited preparation, and interacting on the phone with the family.
>
> . . .
>
> The records failed to identify significant ongoing care for the claimant's physical and mental complaints. . . . His failure to obtain significant medical intervention suggests his conditions were not as limiting as alleged. Likewise, the claimant's injuries occurred primarily in 2003 through

> 2008 and he worked at substantial gainful levels in 2010.
> His capacity to work and his testimony of a layoff, as well
> as the limited medical intervention obtained from 2008
> through 2010 while he was gainfully employed as well as
> limited evidence of exacerbating factors, adversely
> affected the credibility that his limitations in working
> were a product of his injuries and related more likely, to
> his layoff.

Id. at 17.

It is evident that the ALJ considered not only plaintiff's testimony as to his physical impairments, but also his mental impairments including "memory difficulties, getting lost, and difficulties concentrating." Id. He found, based on the evidence, that plaintiff's testimony was not entirely credible because despite his impairments, including his alleged intellectual disability, he was able to work at substantial levels until 2010, when he testified that he stopped working not due to his impairments but due to being laid off. Id.

The ALJ considered plaintiff's subjective complaints and medical evidence in reaching a conclusion about plaintiff's credibility. Substantial evidence exists in the record that plaintiff's statements do not correlate with the objective medical evidence and with his own description of his activities.

#### IV.   Conclusion

Having received the PF&R and the defendant's objections, and having reviewed the record de novo, the court concludes that the decision by the ALJ, and in turn the Commissioner, is supported by substantial evidence.  It is accordingly ORDERED:

1.   That the Commissioner's objections to the PF&R be, and they hereby are, sustained;

2.   That plaintiff's motion for judgment on the pleadings be, and it hereby is, denied;

3.   That the Commissioner's motion for judgment on the pleadings be, and it hereby is, granted;

4.   That the decision of the Commissioner be, and it hereby is, affirmed;

5.   That this action be, and it hereby is, dismissed and stricken from the docket of the court.

DATED: April 14, 2017

John T. Copenhaver, Jr.
United States District Judge